Good morning, your honors, and may it please the court. Charles Ballard for the United States, and with the court's permission, I'd like to reserve two minutes for rebuttal. The district judge here dismissed serious drug charges against the defendant with prejudice because he disagreed with the Central District's decision to suspend jury trials during the COVID-19 pandemic. Neither the Speedy Trial Act nor the Sixth Amendment support that result, and turning first to the Speedy Trial Act, the district court legally erred in construing and applying the ends of justice provision. Starting with that provision's text, the text expressly requires the court to determine whether the ends of justice outweigh the best interests in a speedy trial, which requires a balancing. In Zedner v. United States, the Supreme Court referred to it as the ends of justice balance. This court has also explained that the provision promotes an express balancing of interests, and the district court refused emphatically to treat the ends of justice provision as a balancing test here. On the record at the hearings, for example, at ER 157 and 159, he repeatedly stated that it was not a balancing. Instead of conducting the required balancing, the district judge supplanted the proper test with a rigid impossibility standard, really noting repeatedly on the record at the hearings and as well in his written analysis that a ends of justice continuance could be granted here only if trials were actually impossible. That's not the standard, and in United States v. Murillo, for example, this court cautioned against reading requirements into the Speedy Trial Act, and in particular, the ends of justice provision that were not found in the statutory text. Counsel, I have a question. Go ahead, Judge McGill. I guess, what's your best argument that this, I mean, what appears to be an indefinite suspension on trials doesn't violate our court's directive that the ends of justice continuances must be limited in time? Your Honor, the government actually did not ask for an indefinite continuance. The trial date in this case was in October, and the government asked for a continuance to December. I know, but the district-wide order apparently, I mean, apparently doesn't have an end date, or they haven't been having continual orders saying, we're going to review this in a month, and we're going to review this in 60 days. Is that correct? Am I understanding that correctly? Well, I think Your Honor understands the general order correctly in that there's a specific, there's not a specific end date to the general order. It does outline the criteria that the court intends to consider, or references gating criteria, and the Chief Judge has noted publicly that that, it takes into account the California's color-coded blueprint, but even if there's not a specific end date to the general order suspension of jury trials, that suspension is nevertheless, at any given time, a factor that weighs, I think, heavily in favor of granting an ends of justice continuance out to a particular date. Counsel, could I ask you, could I back up right there, because I think you're Chief Judge of the District Court entered an order declaring a judicial emergency, and then the Judicial Council, excuse me, the Executive Committee of the Ninth Circuit extended that, right? It was extended for a year, up until April 13th, 2021, and you don't seem to be taking that as an extension of a finite end date to the judicial emergency. Is that your position, that it's not? Well, Your Honor, I think there's a difference between the declaration of judicial emergency, which was upheld for a finite period of a year by the Ninth Circuit Judicial Council, and the general order 20-09, which is the actual order that deals with suspending jury trials specifically, and so I think that's the basis, that's a separate order. If the answer to my question is no, you don't take that as the end date, I'll take the answer. I'm just trying to make sure that I'm clear on your position. That's correct, Your Honor. I think the operative order of the court, which is by majority vote of the district judges, is 20-09, which doesn't have a finite end date. Hence, there's no briefing here on 3174. So we've got the August order from the Chief Judge, right? And then there's a November 25th order saying that the the COVID incidence was on the rise as of November 25th. That was, it turns out, and we have the governor and the public health official declared a true lockdown at that point, and that even superseded the blueprint. You'll concede that, I'm sure. Total lockdown, December through into January, yes? Yes, Your Honor. And all of that's publicly available information, and he's tied the jury trial suspension to those public health directives, correct? Yes, Your Honor. That's our understanding from the Chief Judge's comments, is that the gating criteria noted in the order are tied to those. Right, so I just want to make sure we're operating on the same understanding, because I think Judge McGee's question is a very important question. And you know, opposing counsel is going to argue, as they did in the brief repeatedly, and as the district court was very concerned, jury trials had commenced in other places around the state, including across the street in the state court. Yes, Your Honor, and I think that the analysis should focus on the ends of justice continuance that's sought at the time. And the court, the district court, at the time the continuance is sought, has got to make a decision if it grants a continuance, it will grant a continuance out to a specific time, and it will have to make that determination based on all of the factors available to the court at the time. And if one of those factors is a suspension that I think everyone agrees is a good faith decision by the majority of the district judges for public health reasons, a suspension that may or may not have lapsed by the time the trials reset, that's a factor that I think has to weigh heavily in the ends of justice balance. But just turning briefly to the remedy, I think at the very least a decision to suspend jury trials for public health reasons is a circumstance leading to dismissal, if the court were to get to that point, that weighs heavily against a dismissal with prejudice. And in fact, I think all of the relevant factors under 3162 weighed heavily in favor of dismissal without prejudice as the district court found in his tentative analysis. And as the government has set forth in his briefing, I think they manipulated all of those factors to reach the conclusion of dismissal with prejudice. Right. But if I could get you to not devote on the dismissal with or without prejudice, if you could back up, because I'm concerned about the original order dismissing. And Judge Murguia's point is that it seems to me that the analysis would be, because we're concerned about a very important constitutional right here and global pandemic, of course, unprecedented, no question about it. And certainly no question that anybody's doubting the good faith of all of these judges who are doing their very best to try to figure out how to balance. But we were recently reminded by the United States Supreme Court about this very same global pandemic and how we weigh that vis-a-vis another very important constitutional right, which is to worship in person. And it wasn't an all or nothing. And so I'm curious about your best answer to if you could really engage in Judge Murguia's question about this is another important constitutional right, but it is an all or nothing here and we don't have an end in sight. Shouldn't we be very concerned about that? I certainly think it's a concern, Your Honor. And I think those Supreme Court decisions that Your Honor references make a point that the government would concede, which is that, of course, these fundamental constitutional rights don't vanish during the pandemic. That said, I think that the good faith administrative decision by the district court is entitled to significant weight. And it's entitled to weight in a balancing test. And it's, of course, up to the courts to weigh the defendant's important right to a trial against the countervailing factors. But the government believes that certainly here at this point in time, and in this case in particular, given the seriousness of the charges, the defendant's failure to assert his right to a case, the interest in a trial here required the continuance. What's your best response to Perlow and Pascal, our precedent that seems to indicate and imply that trial difficulty or impossibility, I guess, or at least something that makes trials very difficult from happening is an important factor regarding the ends of justice analysis? Well, Your Honor, I think certainly those cases addressed a different type of exigency making trials difficult. And this one is certainly a more persistent one. But I think certainly there's just no impossibility bar in the ends of justice provision. And I go which cautioned against reading rigid requirements like something like impossibility into the statute. And the statute, again, in addition to noting impossibility or leading to a miscarriage of justice also refers to among other factors. And I think regardless of whether an impediment to trial actually makes it physically or logistically impossible, the court should certainly consider that among other factors. I know you're out of time, but I just want to ask this question. I guess if Judge Carney had considered the factors that are listed and then the among other factors that you reference and that is referenced in the statute, would he have been compelled to come out with a different decision here to grant a continuous? I think he would, Your Honor, because of the tremendous weight, I think, that the district court's good faith decision to suspend trials would carry in the analysis. I think he would be compelled to find that that carried the day in the analysis. So if I know you're out of time, but if you could this question, assuming that a defendant showed genuine prejudice with a delay, are you saying that because of the general order that the trial court could not consider that factor? No, Your Honor. I think that the court in conducting the ends of justice balance would absolutely consider prejudice. And I think, you know, I don't know exactly what the case would look like, but it's a case-by-case balancing. So I think the court would absolutely consider that. But there's, of course, none whatsoever on this record. All right. Judge Christin, do you have any other questions? Maybe just one quick one, if I could, Judge McKeon. Counsel, when the district court interpreted 7B, little i, as you've indicated, I think he's reading it as actual physical impossibility is required. I read it a little differently, but setting aside that clause, it seems to me that this suggests that the language suggests that the court shall consider that factor or the result that there may be a miscarriage of justice. And I don't see the latter weighed here in the court's analysis, but I'm aware that some of this was done orally in some hearings and some in writing. Is there any place in the record you can point to me where the court considered the miscarriage of justice factor? I don't think the court considered the miscarriage of justice factor at all, and I think that's clear repeatedly on the record. I think in the August 20th status conference, he mentions it, but I think it's crystal clear in the record that he gave no weight whatsoever to that factor, which I think in this particular case strongly favors, again, the government because of the tremendous miscarriage, I think, of justice that it would be to dismiss these charges under the circumstances. You've answered my question. Thank you, and thank you, Judge McGinn. Judge Lynn, do you have any other questions? Okay, thank you, Mr. Fowler. Mr. Laughlin, we went five minutes over, almost five minutes, and so I'll up your time to 15 minutes if you need it. Thank you, Your Honor. Excuse the court, I'm James Laughlin again, and here representing the appellate Jeffrey Olson. The state and federal courts in the central district face the same pandemic circumstances. By last summer, the state courts had adopted reasonable safety protocols and began resuming trials to the point where they've now done more than 550 jury trials, while the there has been no justification about why the state courts have done so much of a better job in fulfilling this constitutional role than the federal courts. I think that's right, and it's a disturbing hole in the record, if you will, but the federal court has been clear that it's tying this to the blueprint, and there isn't any mention of the industrial guidance that's baked into the blueprint, and there isn't any mention here about how the blueprint was built, although we've had in this circuit extensive litigation about that, including the state's epidemiologists explaining the factors and why one venue can't be equated to another venue. So one of those, just to give you one example, a very important factor when one looks at that blueprint, and the state's experts are absolutely consistent on this, is ventilation, for example, just to take one factor. Ventilation, and we don't have any information about what the ventilation system is like in this court, in these courts that you're wanting us to compare. So, you know, I don't get past the first factor before wondering, what is it you want me to do with that? Well, Your Honor, there's two things. One, I don't think that at this stage, a year in, the benefit of the doubt that the federal courts with generally more resources and generally bigger courtrooms are less equipped to deal with the consequences of the pandemic than the state courts have been. There's no evidence of that, and I don't think... Do we have any evidence that the state courts, I'm not trying to disparage anybody, but it is a deadly virus, a very deadly virus in Yeah, there's certainly no evidence to the contrary, despite the government's citation of a few newspaper articles. And again, I mean, I guess it all depends on how much faith the court wants to give to its state court colleagues. I have faith that if they were conducting trials and seeing people getting sick and dying, they would have pulled back on them, changed procedures, or done something in response. Absolutely, but I don't know what resources they had to work with in terms of the facilities, how well they were able to space out the jurors, for example, I mean, that statistic alone causes me to have dozens of questions that I would want to ask them. That's the only point I'm trying to make, counsel. Okay, well, I guess the other point your question raised, Your Honor, is this reliance on the blueprint. And I think what frustrated Judge Carney and what frustrates me, quite frankly, is this is a state court plan designed for non-essential businesses that the California doesn't even apply to its own state courts. And the article in which the chief judge said we're taking, quote, the easiest way by filing this plan is unreasonable when, as Your Honor said, the courthouse has its own set of circumstances that it should deal with, and it's uniquely qualified to deal with those circumstances because a court has, particularly with the assistance of its staff and protective services officers, to implement and enforce safety protocols. It shouldn't be guided about when a movie theater that doesn't have those kinds of things can reopen. But when you mention movie theater, you just, I think, step into more hot water, if I might, because this order doesn't, it mentions the blueprint, but none of the industrial guidance, counsel. And the industrial guidance is special guidance, you know, sort of business by business, sector by sector. Well, I mean, I'm sorry. No, go ahead. I was gonna say, I am at somewhat of a disadvantage because for the last year, whatever's going on in the Ninth Circuit is sort of like a black box in which we can't see inside of. The glimpses we get are when the chief judge gives an interview to a newspaper mentioning things like the blueprint and tier one, tier three, tier four, when Judge basing their decisions off of the blueprint. So we're going off of that, but there's not, the central district has not been forthcoming. If it has good reasons why it can't do what all the other counties within its own borders have successfully done for months, then it should tell somebody. So we can then just litigate whether or not that's an appropriate procedure. Until then, I think that we have to look at what Judge Carney did in this particular case. Again, he's the judge in this case who makes the call based on all the facts and circumstances as he sees them. And I think that looking at the circumstances of the community, looking at the trials across the street, looking at the trials in other federal district courts that have successfully had them, including the adjacent Southern District, talking about all the protocols he was going to be putting in place to have a safe trial, he reasonably concluded a trial could go forward on the scheduled date. And that is not clearly erroneous. The government's approach seems to be that... Did he make a finding, forgive me, but did he make a finding ever, and this is a sincere question, I'm not trying to give you a hard time. We're all trying to grapple with this. Did he make a finding that the trial could go forward safely? Yes. Yes. Because you see, I mean, he said that... Can you tell me where did he say that? Counsel, I thought his main reason and the only reason that it wasn't impossible, he seems to focus on that. His standard that he applies is impossibility, a trial impossibility. And I'm kind of trying to find where in the text supports that reading of the statute, because I'm not sure that the provision of the H7 little i says that. I think the case is the best, I mean, I understand there's furlough and Pascal that talk about how difficult it is to get a trial together, but I'm not sure that that's the only factor, even if trial impossibility is the steady thing about safety, safe, proceeding safely, except for when he was referring to what was happening across the street. Did he say anything about safety? Yes. And I mean, I can find the site for you, but I mean, it was in the context of saying, here are all the safety protocols that the other state courts are using, I'm going to use the same thing. You talked about that in some detail. So I, I take that as... I'm familiar with that part of the record. I understand. Thank you. Well, when you address this question of impossibility, Mr. Laughlin, I'd like you to address whether in fact it was impossible for there to be a trial, because my understanding is that Judge Carney could not get a jury because the order of the court to which he was subject prevented him from getting a jury. So I agree with Judge Merguia. I don't see where that's required, but even if it is, wasn't it in fact impossible given the order of the district court? No, and that's a very problematic point that the government is making, but I want to, if I can talk to, respond to Judge Merguia first regarding the impossibility standard. Judge, I understand why the government wants to make this into a legal error because it changes to de novo review instead of what should be clear error review, because he did the balancing required, so it focuses on these words like impossibility. Those words didn't come out of a vacuum. This used the word impossibility and paschal, and Pollock used the word unavoidable delay. He certainly wasn't going out on a limb and using that kind of language in talking about what the standard is, but the bigger thing is you look at the order as a whole, and he's doing exactly the kind of balancing that the rule requires. He's looking at all of the circumstances in his community, and he's including the safety measures that can be taken, and he's saying, does the significant interest in the defendant and the public in the speedy trial going forward outweigh these other things? And he said he did, and I think that's a valid finding that should be reviewed for clear error, and it's not clearly erroneous. Now, going to Judge Lynn's question, here's the problem with what I had with the government said in the reclai brief and what they said again this morning. It's very tricky. They say, first of all, they said this morning that the jury ban order is just a factor the court has to consider in its balancing, but their end position is that order is dispositive, as Your Honor just said. If that order's in place, a trial can't happen, end of story, you have to grant a continuance. So even as they, first of all, they refused to defend the jury trial ban to the reply brief, thereby waiving it, but even as they did that, you'll notice a quote in their brief where they say, but this case really isn't the place to assess whether the central district took the right approach. So what they're saying is the jury trial ban is unenforceable, and as long as it's in place, indefinitely in place, the trial judge and every other trial judge in the district has no choice but to continue trials indefinitely. So it doesn't matter that the government says, well, technically, even though that ban is indefinite, we only go into court, you know, two, three months at a time and kick it out a little bit, so it's not indefinite. If you buy the government's position that the order itself requires every single continuance, then the continuances are de facto indefinite. But you said you say that the judge considered all the factors. I'm not quite sure did he? Because there are listed factors, and then there are among other factors, and I'm not quite sure. He focused a lot on the trial and possibility, and then, and with that, primarily sending a message to his colleagues on the central district that he believed, you know, Mr. Olson's rights were being violated, and he repeatedly referred to his fulsome review of all the factors that other judges would do in applying the statute. And just to be clear, you're talking about the statute of the remedy or the continuance in the first place? The continuance in the first place, both actually. Because you talked about sending a message as the reason for, as this court did in Clymer, as the First Circuit in Ramirez, there's times when you have to send a message. That's typically sending a message to the government because the government is engaged in some kind of delay or misconduct. There's no such allegation here. In Clymer, the court did it to send a message to the government and the courts. In Burt, the Second Circuit did it to send a message to the courts. We have a very unique record here where a tentative order was issued coming out one way, dismissing without prejudice, and then it was flipped. And I think the reason it was flipped pretty expressly in this record was it sent a message, as Judge McGeough indicated, to the district court's colleagues and chief judge on the court. Would you disagree with that? I think it's appropriate what the judge did. That's why they have... No, my question was, do you disagree? That's what he did, isn't it? Isn't that what the record tells us? Or are we missing something here? No, he validly determined, as the Supreme Court's tailored decision allowed, he validly determined that in this case, it was necessary to dismiss with prejudice. Because as he said, quote, it's the only hope of the central district changing its practice. It's now been another 141 days. Right, counsel. So if you could answer my question, I'd really appreciate it. And I'm not trying to be sneaky about this at all. The question is, isn't he trying to send a message here to his colleagues, not to the government? Isn't that right here in this case? Yes, and that's completely appropriate. It's completely appropriate to instigate a change in behavior by, as the First Circuit said in Ramirez, giving the cautionary reminder in the form of a dismissal with prejudice that you have to comply with the speeding trial act. You just told Judge McGee that you think that he engaged in weighing and balancing, and he weighed the factors. But I asked opposing counsel, so in fairness, I want to ask you, is there a place in the record where this district judge considered whether this denial of a I do think, though, that the overall, I don't know if he used that language at a particular point conducting the things, but the thrust of his whole ruling was that depriving defendants of their right to a trial at this point was a miscarriage of justice. Now, the government claims it's a miscarriage of justice to dismiss. So miscarriage of justice arguably could go either way, but he made the call of trial, Joy, and I don't think it's clearly erroneous to say it's more of a miscarriage of justice to not let trials go forward at this point. If you concede that it could go either way and there isn't an express finding, should we remand on that issue? No, I don't think that's necessary because, like I said, I think that it's, I mean, I'll follow up if I see an express finding, but I think that it's an implicit finding given he quoted the standard and he talked about expressly what was the problem he had with the situation, which is the, not only the denial, but the lack of proper respect for the constitutional rights of people who want to be in trials. So do you concede that the government was not at fault here? No, no. I mean, I think that the, I think even though the judge in the end focused solely on the central court conduct, he begged repeatedly for the government to step up and support his position saying, you're continuing to indict people. You took the steps necessary to get the grand jury to meet. That was no problem for you. And yet, and I'll also point out that. What was the government supposed to do here, Mr. Lockwood? To advocate on behalf of the constitutional rights of the defendant. Let me ask this. Do you concede that the government didn't have any control over issuing subpoenas and getting a trial to go forward? Well, Cora, I agree that, that if the jury trial, the judge, the chief judges refuses to call jurors preventative jury trial. And that was not the fault of the government. The fault of the government was not taking the many invitations of Kearney to put the weight of the justice department, which did intervene in things like church cases when it thought constitutional rights were important enough to be defended. It did not take steps. It basically stood back and said, it's not our problem. We don't have a dog in this fight. Whatever the court wants to do is fine with us. And then there's the second circuit noted in Burt. That's a very, that's a very risky approach. Yeah. I guess the last part I wanted to cover, I know you're well over time, but let me go ahead and ask this is, um, you know, he dismissed this with prejudice and saying that doing otherwise wouldn't, it would be a toothless or without teeth, a response. And I'm not sure I understand that in light of our case law and Supreme court case law that clearly sets forth that dismissing with, you know, without prejudice is not, you know, without consequence. And he acknowledged that he did not say as a government said that it's a toothless sanction. He says he doesn't have enough teeth. And that means that the governance approach seems to want to be that the consequences of dismissal without prejudice are always good enough. So there's never a good reason to go to the next level. What the judge did here was gave very good reasons for saying, you know, in this context, if I dismissed with prejudice and you just refile under the statute of limitations, basically you and the central district are just getting the delay you anyway. So a dismissal with prejudice is the remedy that gets behavior to change now and in the future. Judge Kristen, do you have any further questions? Nothing further. Thank you. I want to thank both counsel for their patience with my questions. Judge Lynn. Okay. Mr. Fowler, I think you were well over time, but I will give you two minutes. Thank you, your honor. I want to start by addressing the findings that the court actually made on the record. And I was able to find quickly the court actually did not make a finding that jury trials were safe, would be safe. If anything, he made the opposite at ER 17 and 18 where he acknowledged that the general order was relies on the premise that the pandemic rendered it unsafe to conduct a jury trial. But then went on to say the court acknowledges the risk, but that is not what the constitution requires and goes on to emphatically with emphases restate his standard that a trial would have to be impossible. So I think the record certainly contains, I think that both suggests that the the court did some kind of implicit balancing or that he did consider all of the appropriate factors under the ends of justice provision. I think he clearly did not. What relief are you seeking? We're seeking reversal of the order and the finding that the ends of justice outweigh the best interest in a speedy trial. I think the only, I think with that guidance, the only matter left for the district court to determine vis-a-vis his order that would be reversed would be to set a reasonable date for trial to determine a reasonable duration of a continuance in light of the guidance that this court would provide. Judge Kristin, do you have any further questions for Mr. Fowler? No, I don't. Thank you. Judge Litt, no, I don't. Okay. Thank you, Mr. Fowler, Mr. Lachlan. I appreciate your oral arguments here today on these very difficult, challenging issues that are presented in these in these cases. Thank you very much. The cases, if I didn't say it before, the case of the United States v. Torres is now submitted as well as the case of United States v. Jeffrey Olson.
judges: Murguia, Christen, Lynn